# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF IDAHO

In Re:

**Jonnie Elisabeth Larsen,**

        **Debtor.**

**Bankruptcy Case
No. 13-40505-JDP**

### MEMORANDUM OF DECISION

**Appearances:**

Aaron J. Tolson, TOLSON & WAYMENT, Ammon, Idaho,
Attorney for Debtor.

Jay A. Kohler, Idaho Falls, Idaho, Attorney for creditor
Medical Recovery Services, LLC.

### *Introduction*

In this interesting case, the Court is called upon to consider the
scope of a collection agent's duty after receiving credible information that
a debtor has filed for bankruptcy protection to determine if the creditor's
claim was discharged.

The issue is presented to the Court via an Amended Motion for

MEMORANDUM OF DECISION - 1

Sanctions ("the Motion") filed by chapter 7[1] debtor Jonnie Elisabeth Larsen

("Debtor")[2] targeting collection agent Medical Recovery Services ("MRS"),

alleging that MRS willfully violated the discharge injunction in this case,

and seeking an award of damages.  Dkt. No. 49.  The Motion came before

the Court for a hearing on September 20, 2017, at which the parties,

represented by counsel, presented evidence, testimony, and arguments.

The Court then took the issues under advisement.  Dkt. No. 59.

After due consideration of the record, evidence, and the parties'

arguments, as well as the applicable law, this Memorandum sets forth the

Court's findings of fact and conclusions of law and the reasons for its

decision concerning the Motion.  Rules 7052; 9014.  Simply put, the Court

concludes that Debtor is correct:  a willful discharge violation occurred in

this case and compensatory sanctions are appropriate.

---

[1]  Unless otherwise indicated, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101 - 1532, and all rule references are to the
Federal Rules of Bankruptcy Procedure, Rules 1001 - 9037.

[2]  At the time Debtor filed her bankruptcy petition, her name was Larsen.
Thereafter, she married and changed her name to Willsey.

MEMORANDUM OF DECISION - 2

*Findings of Fact*

Regrettably, the material facts in this case resemble what the Court

suspects is a fairly typical scenario concerning collection practices

employed by collection agents in their dealings with discharged debtors.

On April 29, 2013, Debtor filed a chapter 7 bankruptcy petition.  Dkt.

No. 1.  In her schedules, she did not list a debt she owed to Dr. Jamison

d/b/a Brad Jamison Chiropractic for medical treatments she had received.

*Id*.  According to her testimony at the hearing and in her answers to

interrogatories, Debtor failed to schedule Dr. Jamison's claim because she

did not believe she owed Dr. Jamison any money at the time she filed her

petition.  Ex. 100, Answer to Interrog. No. 2.  As it turns out, this

assumption was incorrect, and Debtor's omission would play a role in

later events.

The notice sent by the Clerk to listed creditors at the time of the

bankruptcy filing indicated that, based upon the schedules, Debtor's case

would not yield any distributions to creditors, and therefore, creditors

need not file proofs of claim unless later directed to do so.  Dkt. No. 3.  A

MEMORANDUM OF DECISION - 3

discharge was entered in Debtor's bankruptcy case on October 21, 2013.

Dkt. No. 31.  And just over a year later, on November 18, 2014, the chapter

7 trustee filed a "no-asset" report and requested that the bankruptcy case

be closed.  An order closing the case was entered on November 19, 2014.

Dkt. No. 35.

Prior to filing her bankruptcy petition, Debtor had visited Dr.

Jamison's office for treatment on nine separate occasions, and had accrued

an unpaid debt totaling $390.  Ex. 207.  Following her bankruptcy filing,

Debtor returned to see Dr. Jamison twice more, on March 3 and April 2,

2014.  However, Debtor paid the charges for each of those two treatments

in cash.  *Id*.

Dr. Jamison utilized a third-party service called Entrada to bill his

patients.  Presumably still unaware of the bankruptcy filing, on November

10, 2015, Debtor's account, now delinquent for the $390 for her

prebankruptcy treatments, was assigned to MRS, a local collection agency

that collects medical debts.  Ex. 204A.  It is unclear whether Dr. Jamison or

Entrada assigned Debtor's account to MRS to collect.

MEMORANDUM OF DECISION - 4

The information MRS received from Entrada to initiate the collection process was scant. Ex. 203 at 4. It listed Debtor's personal information and the amount of the delinquent account balance. It showed the date of Debtor's last office treatment and the date that balance was "brought forward," both listed as August 11, 2014, and also contained a brief log of events concerning Debtor's account, including notes about phone calls made to Debtor, notices sent to her, and such. *Id*.

Following assignment of the debt, as was its usual practice, MRS mailed a "first notice" to Debtor on November 13, 2015. Ex. 204B. Lacking any response, MRS sent Debtor a "final notice" on December 14, 2015. *Id*. Per MRS protocols, when there was no response from Debtor nor activity on the account following the "final notice," the account was reviewed by MRS personnel and approved for referral to counsel for legal action on October 19, 2016. Ex. 204D.

Smith, Driscoll & Associates, PLLC (the "Law Firm"), the attorneys hired by MRS to take legal action to collect Debtor's account, also received only the briefest information from MRS about Debtor's account in what

MEMORANDUM OF DECISION - 5

was called  a "legal account summary" sheet.  Ex. 204F.  In the Law Firm's

records, while Brad Jamison Chiropractic was listed as the "client," it is

clear that the Law Firm took its instructions from MRS.  The summary

sheet contained only Debtor's personal information, the original and

current balance on her account  – in this case, both $390 – and the date the

unpaid debt was supposedly incurred, again, that being August 11, 2014.

*Id*.  Relying upon the summary sheet, the Law Firm filed suit in state court

on behalf of MRS, as plaintiff, against Debtor, as defendant, on October 21,

2016.  Ex. 200 at p. 1.  The complaint sought to recover the $390 principal

amount owing to Brad Jamison Chiropractic, plus prejudgment interest

and attorneys fees, for a total prayer of $1,056.91.  *Id*.

When Debtor became aware of this legal action, she promptly

consulted her bankruptcy lawyer, Aaron Tolson, about it.  Mr. Tolson filed

a "Notice of Bankruptcy" in the state court action on November 22, 2016.

Ex. 200 at p. 7.  While apparently not intended to be a formal response to

the complaint, the notice advised the Law Firm and state court that the

debt sought to be collected from Debtor in the action had been incurred

MEMORANDUM OF DECISION - 6

before her bankruptcy petition was filed, and therefore, that it was subject to the discharge entered in the bankruptcy case.  *Id*.

The Law Firm maintained an automated call log to contemporaneously document any phone calls made or received by its staff concerning its collection cases.  Ex. 206.  The system recorded the time of any call, and date-stamped the entry concerning the call.  The call log for Debtor's case indicated that, presumably in response to the notice he had filed in the collection action, an employee of the Law Firm called Mr. Tolson on December 1, 2016, and left a message requesting that he contact the Law Firm.  *Id*.

While Tolson did nothing further in the state court action, because contact with an attorney for Debtor had occurred, on December 7, 2016, the Law Firm filed a "Notice of Intent to Take Default" indicating that it intended to seek a default judgment against Debtor unless a response to the complaint was promptly filed.  The Law Firm sent Mr. Tolson a copy of the default notice, accompanied by a letter stating that, after a review by MRS of  the account information, it appeared the charges referenced in the

MEMORANDUM OF DECISION - 7

complaint had been incurred on August 11, 2014, was therefore a post-bankruptcy debt, and had not been discharged in Debtor's bankruptcy case. Ex. 203 at p. 1.[3]

The Law Firm's next call log entry for Debtor's case was December 21, 2016, and evidenced a call with Mr. Tolson in which he apparently acknowledged the Law Firm's understanding that the debt involved in the legal action was incurred post-bankruptcy, and advised that he had sent a letter to Debtor informing her that she needed to take care of the debt. During that call, Mr. Tolson further allegedly informed the Law Firm that he was not representing Debtor in the state court action. According to the Law Firm's paralegal who testified at the hearing, following that call, the Law Firm "felt comfortable" in moving forward with the legal action.

The following day, December 22, 2016, MRS filed an application for entry of clerk's default and a default judgment in the state court action.

---

[3] The record is unclear whether, in connection with Mr. Tolson's notice filed in the state court action, either MRS or the Law Firm attempted to find out any additional information about either Debtor's bankruptcy case, or about the accuracy of the account information on which they were relying.

MEMORANDUM OF DECISION - 8

Ex. 200 at pp. 11-15.  On January 3, 2017, a clerk's default was entered, and on the same day, a judgment was entered by the state court in favor of MRS and against Debtor for $1,076.91, which included principal, interest, attorneys fees, plus filing and service fees.  Ex. 200 at pp. 16-20.

The Law Firm then set out to enforce the judgment.  It recorded an abstract of the judgment, executed by the Bonneville County clerk, in Jefferson County, Idaho on January 10, 2017.  Ex. 201.  The following day, the Law Firm filed an application for order of continuing garnishment in the state court action, which was granted in an order entered on January 18, 2017.  Ex. 200 at pp. 21-25.  When the garnishment order was served on Debtor's employer, her office manager informed Debtor about its consequences.  This apparently motivated Debtor to pursue the matter of the judgment more pointedly and directly.

On January 23, 2017, Debtor personally called the Law Firm to inquire about the basis for the garnishment.  During this call, she "insisted" to the person to whom she spoke that the debt being collected had been discharged in her bankruptcy.  Ex. 206.

MEMORANDUM OF DECISION - 9

Debtor then contacted Mr. Tolson's office to again enlist his help.  In response, on January 27, 2017, his law partner, Andrew Wayment, called and spoke with counsel for MRS, who, finally, agreed to retrieve an itemized list of services provided by Dr. Jamison to Debtor from MRS to support the judgment debt.  Ex. 206.  SueAnn Anderson, the assistant manager at MRS, was asked by the Law Firm to review its database concerning Debtor's account.  When she did, she located the brief document generated by Entrada which had been given to MRS when the agency was assigned Debtor's account to collect; MRS, in turn, provided the document to the Law Firm on February 16, 2017.  Ex. 205.  But as discussed above, that cryptic summary document did not itemize the dates of services provided by Dr. Jamison to Debtor, or the charges or payments made on the account.  As noted above, as is relevant here, the document indicated the balance due on Debtor's account had been  "brought forward" on August 11, 2014, that the delinquent balance was $390, and that Debtor's last visit to Dr. Jamison occurred on August 11, 2014.  *Id*.  The document given to the Law Firm by MRS also acknowledged that Debtor

MEMORANDUM OF DECISION - 10

had informed MRS that, while she had visited Dr. Jamison twice in 2014,

that she had paid the charges for those visits in cash.  *Id*.

Mr. Wayment also followed up with counsel for MRS, Mr. Hurley,

in a February 16, 2017 email, noting that he understood Mr. Hurley was

going to have Brad Jamison Chiropractic provide more complete

documentation for Debtor's account indicating the amounts billed and the

dates the charges were incurred.  Ex. 203 at p. 2.  In that same email, Mr.

Wayment explained to Mr. Hurley that Debtor had started using a

different chiropractor following her bankruptcy, and therefore, the debt

MRS was collecting was incurred before Debtor's bankruptcy and had

been discharged, that the default judgment MRS held against Debtor was

invalid, and that, through enforcing it, MRS may be exposed to sanctions.

*Id*.

Mr. Hurley responded to Mr. Wayment by email that same day,

contending that the information in possession of MRS and the Law Firm

indicated the subject charges arose after bankruptcy, in August 2014, that

Debtor had visited Dr. Jamison twice in 2014, and from those visits, had

MEMORANDUM OF DECISION - 11

incurred the $390 debt.  Ex. 203 at p. 3.  To support his statements, Mr.

Hurley attached the one-page document generated by Entrada to his

email.  Ex. 205.

Mr. Wayment responded on February 21, 2017, also by email, again

pointing out that the Entrada document did not show the dates of service,

but only that the balance due had been "carried forward".  Ex. 203 at p. 5.

Mr. Wayment once again highlighted Debtor's assertion that her

prebankruptcy debt to Dr. Jamison had been discharged, and Mr.

Wayment threatened to take legal action against MRS if there were any

further attempts to collect from Debtor.  *Id*.

The following day, February 22, 2017, Mr. Hurley responded by

email to Mr. Wayment, disagreeing with Wayment's interpretation of the

Entrada document, and reiterating his position that the relevant bills arose

from Debtor's visit to Dr. Jamison on August 11, 2014, after bankruptcy,

and that the balance due for those services from that date was brought

forward onto the report.  Ex. 203 at p. 6.

Mr. Wayment responded the next day, February 23, 2017,

MEMORANDUM OF DECISION - 12

reasserting his belief that the Entrada document did not indicate the dates

of service, but merely when the balance was brought forward.  Ex. 203 at

p. 7.  The email again stated Debtor's position that the $390 bill "cannot be

for any services provided for in 2014, but for services that were provided

prior to this time."  *Id*.  Mr. Wayment advised that, until MRS produced

records from Dr. Jamison showing the dates and services provided, he and

Debtor would maintain that they were prepetition charges and therefore

discharged.  Mr. Wayment then stated "[w]e specifically request the

original underlying medical records and the billing records" and again

threatened the possibility of sanctions against MRS for its collection

actions.  *Id*.  Mr. Wayment followed up with another email to the Law

Firm the next day, February 24, 2017, in which he again requested the

documentation to support MRS's allegation that the debt was incurred in

2014.  Ex. 203 at p. 8.

On March 14, 2017, Debtor called Mr. Wayment and was "panicked"

because the sheriff's office was still attempting to garnish her wages.  Ex.

203 at p. 9.  That same day, Mr. Wayment again emailed Mr. Hurley and

MEMORANDUM OF DECISION - 13

indicated that Debtor had repeatedly gone to Dr. Jamison's office attempting to get the relevant documentation about her account herself. *Id*. He asked Mr. Hurley to have the sheriff's office hold off on enforcing the garnishment until that documentation was obtained, and again threatened suit by Debtor against MRS. *Id*.

In March 2017, Debtor was finally able to obtain her medical records from Dr. Jamison showing the dates she had been seen by him, as well as the doctor's notes for each visit. Mr. Tolson provided those records to MRS's counsel on March 24, 2017. Ex. 203 at pp. 10-41. The records documented that, consistent with all of her prior statements, Debtor had indeed made two post-bankruptcy visits to Dr. Jamison, occurring on March 3 and April 2, 2014, as well as numerous prepetition visits in 2011, and one in 2012.

The Law Firm apparently requested yet more information from MRS regarding the service dates underlying Debtor's bill.[4] On March 29, 2017, the Law Firm called MRS to check on the status of that request. Ex.

---

[4] The record is not clear about when this request was made.

MEMORANDUM OF DECISION - 14

206.  After that second request for additional information, Ms. Anderson

testified that she first inquired of Entrada, but was told it did not have any

further information to provide.  It was only then that she sought to contact

Dr. Jamison directly.  However, it took considerable time for her to reach

him, as Dr. Jamison's wife was apparently undergoing medical treatments

in Utah and he was frequently out of the office.

At some point, MRS staff was finally able to visit with Dr. Jamison,

and report back to the Law Firm.  The call log indicates that on April 5,

2017, the Law Firm was first informed that MRS had spoken to Dr.

Jamison, and that he confirmed that Debtor's unpaid $390 debt was for

services provided to her prior to the bankruptcy filing.  Apparently based

on that information, the call log entry acknowledged, for the first time, that

"[t]his would mean we shouldn't have filed suit.  If the documents show

this we'll send motion to set aside default."  Ex. 206.  The same day the

Law Firm learned of this information, April 5, 2017, it notified the sheriff

to discontinue the continuing the garnishment and to release of any funds

held.  Ex. 208.  A return of service from the sheriff indicated no funds had

MEMORANDUM OF DECISION - 15

been collected from Debtor's employer pursuant to the garnishment.  Ex. 200 at p. 27.

Ashley Doman, a paralegal at the Law Firm, testified that it was MRS's policy to continue any pending legal proceedings against a debtor until the Law Firm was provided reliable information that a debt it sought to collect may have been discharged in a bankruptcy case.  On April 14, 2017, the Law Firm received a document from MRS that it had obtained directly from Dr. Jamison's office that same day.  Ex. 207.  That document provided a list of the dates Debtor was treated at the office, the services provided, as well as a running tally of the charges incurred.  *Id*.  It clearly indicated that the prepetition visits were the basis for the $390 delinquent bill, and that the charges for Debtor's post-bankruptcy visits in 2014 had indeed been paid.  *Id*.

That same day, April 14, 2017, the Law Firm filed a Motion to Set Aside Default and Default Judgment; an order granting that motion was entered by the state court on April 19, 2017.  Ex. 200 at pp. 26-31; Ex. 206 (4/14/17 entry date).  On April 21, 2017, a release of judgment lien was

MEMORANDUM OF DECISION - 16

recorded in Jefferson County, Idaho.  Ex. 201.  However, as of September

20, 2017, the date of the hearing on the Motion, the MRS and the Law Firm

had taken no affirmative steps to obtain a dismissal of the state court

action filed against Debtor, and the Court presumes it remained pending.

On May 25, 2017, Debtor filed a motion to reopen her bankruptcy

case, Dkt. No. 35, as well as a motion seeking sanctions against MRS for

violating the automatic stay, Dkt. No. 37.  An order granting the motion to

reopen was entered on May 26, 2017.  Dkt. No. 40.  The sanctions motion

was later amended to change Debtor's claim against MRS to one for a

violation of the discharge injunction, rather than a stay violation.  Dkt. No.

49.

///

///

### *Conclusions of Law and Disposition*

A.    Legal Standard

Section 524 explains the effect of a bankruptcy discharge.  The

discharge embodies a fundamental policy of the Bankruptcy Code such

MEMORANDUM OF DECISION - 17

that, through bankruptcy relief, a debtor may achieve a financial "fresh

start," free from the heavy burden of excessive debts. *Scheer v. The State*

*Bar of Cal. (In re Scheer)*, 819 F.3d 1206, 1209 (9th Cir. 2016); *Huskey v.*

*Tolman (In re Tolman)*, 491 B.R. 138, 149 (Bankr. D. Idaho 2013).

The § 362(a) automatic stay, which arises when a petition is filed,

prevents collection of prebankruptcy debts during the bankruptcy case,

but it terminates upon entry of a discharge in favor of the debtor.

362(c)(2)(C).  Thereafter, the discharge protects the debtor and "operates as

an injunction against the commencement or continuation of an action, the

employment of process, or an act, to collect, recover or offset any such debt

as a personal liability of the debtor, whether or not discharge of [a debt

discharged under section 727 ] is waived." § 524(a)(2).[5]  As provided in §

727(b), the scope of the discharge in bankruptcy extends to "all debts that

arose before the date of the order for relief under this chapter . . . " except

---

[5]  Notable here, under § 524(a)(1), the entry of a discharge also "voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727 . . . , whether or not discharge of such debt is waived."

MEMORANDUM OF DECISION - 18

those excepted from discharge in § 523(a).  *See In re Dickerson*, 510 B.R. 289,

296 (Bankr. D. Idaho 2014) (noting that "a chapter 7 discharge will prohibit

the collection of all of a debtor's pre-bankruptcy debts, except those debts

expressly excepted from discharge under § 523(a))."

In this case, Debtor alleges that MRS, acting through the Law Firm,

violated the discharge injunction through its efforts to collect the Jamison

Chiropractic debt from Debtor.  If correct, and Debtor's statutory right to a

financial fresh start was impaired, it is a serious matter.  Indeed, someone

who knowingly violates the Code's discharge injunction may be held in

contempt under § 105(a).  *Id.* at 297 (citing *Zilog, Inc. v. Corning (In re Zilog)*,

450 F.3d 996, 1007 (9th Cir. 2006) (citing *Renwick v. Bennett (In re Bennett)*,

298 F.3d 1059, 1069 (9th Cir. 2002)).[6]

"To prove that a sanctionable violation of the discharge injunction

has occurred, the debtor must show that the creditor:  '(1) knew the

discharge injunction was applicable and (2) intended the actions which

---

[6] While those who violate the discharge injunction may be subject to
sanctions for contempt, debtors have no "private right of action" against violators
for damages.  *See Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 510 (9th Cir. 2002).

MEMORANDUM OF DECISION - 19

violated the injunction.'" *Id.* (quoting *Nash v. Clark Cnty. Dist. Attorney's*

*Office (In re Nash)*, 464 B.R. 874, 880 (9th Cir. BAP 2012) (quoting *Espinosa v.*

*United Student Aid Funds, Inc.*, 553 F.3d 1193, 1205 n.7 (9th Cir. 2008)).  Put

another way, in order to establish contempt, "the debtor must show that

the target creditor was aware of the discharge injunction and its

applicability to the claim." *In re Dickerson*, 510 B.R. at 297 (citing *In re Nash*,

464 B.R. at 880 (citing *In re Zilog*, 450 F.3d at 1007-09)).  In explaining this

legal standard, the Ninth Circuit BAP has observed:

> Taken together, *Bennett*, [*Knupfer v. Lindblade (In re Dyer)*, 322
> F.3d 1178, 1191 (9th Cir. 2003)], and *Zilog* demonstrate that the
> Ninth Circuit has crafted a strict standard for the actual
> knowledge requirement in the context of contempt before a
> finding of willfulness can be made.  This standard requires
> evidence showing the alleged contemnor was aware of the
> discharge injunction *and* aware that it applied to his or her
> claim.  Whether a party is aware that the discharge injunction
> is applicable to his or her claim is a fact-based inquiry which
> implicates a party's subjective belief, even an unreasonable
> one.

*Emmert v. Taggart (In re Taggart)*, 548 B.R. 275, 288 (9th Cir. BAP 2016)

(emphasis in original); *Desert Pine Villas Homeowners Assn. v. Kabiling, (In re*

*Kabiling)*, 551 B.R. 440, 445 (9th Cir. BAP 2016);  *In re Dickerson*, 510 B.R. at

MEMORANDUM OF DECISION - 20

297-98.

A debtor must demonstrate that a creditor has violated the

discharge injunction by clear and convincing evidence and that sanctions

are justified. *In re Zilog*, 450 F.3d at 1007 (citing *In re Bennett*, 298 F.3d at

1059). But after such a showing has been made, the burden shifts to the

offending creditor to demonstrate why it was not able to comply with the

discharge order. *In re Bennett*, 298 F.3d at 1069.

B.      Debtor's Failure to List the Claim in the Bankruptcy Schedules

Generally, under § 523(a)(3)(A), if the debtor does not list a creditor

in her schedules so that the creditor is given notice of the bankruptcy filing

by the clerk, that creditor's debt will not be discharged. This is because,

lacking effective notification of the bankruptcy, the omitted creditor will

not have the opportunity to file a proof of claim and receive a distribution

on its claim. As a result, under this Code provision, a creditor omitted

from the schedules will be able to collect from the debtor after the

discharge order is entered.

However, there is an important, judicially-created exception to the

MEMORANDUM OF DECISION - 21

§ 523(a)(3)(A) exception to discharge which operates in so-called "no asset" chapter 7 cases such as the one at bar. *See Beezley v. California Land Title Co. (In re Beezley)*, 994 F.2d 1433 (9th Cir. 1993); *In re Venegas*, 257 B.R. 41, 46-47 (Bankr. D. Idaho 2001). In simple terms, the Ninth Circuit in *In re Beezley* held that, in no-asset chapter 7 cases, it will not matter that debts of the type described in § 523(a)(3)(A) are not listed in the debtor's schedules or that no notice of the bankruptcy case was given to the creditors holding those debts. Because the purpose of § 523(a)(3)(A) is to protect a creditor's opportunity to share in distributions from the liquidation of the debtor's assets, in no-asset Chapter 7 cases, where no proofs of claim are filed, no assets are available for liquidation, and nothing will be paid to creditors, the omitted creditors are not prejudiced. In other words, as explained in *In re Beezley,* in a no-asset chapter 7 case, unlisted creditors' claims will be discharged even though they received no formal notice of the bankruptcy filing and despite § 523(a)(3)(A). *Id.* at 1440-41.

Rule 2002(e) provides that when, based upon the information in the debtor's schedules, it appears no distribution will be made to creditors, the

MEMORANDUM OF DECISION - 22

notice of the bankruptcy filing sent to creditors by the clerk may include a

statement that it is unnecessary for creditors to file proofs of claim.  That is

what occurred in Debtor's case.  *See* Notice of Chapter 7 Bankruptcy Case

at 2, Dkt. No. 3.  Because no proofs of claim were to be filed with the Court

in this no-asset case, no "bar date" was set for filing proofs of claim, and *In*

*re Beezley* instructs that § 523(a)(3)(A) did not operate to except any

omitted claims from discharge.  *Id*. at 1436 (O'Scannlain, C.J. concurring);

*In re Davies*, 2017 WL 4863012 (Bankr. D. Idaho, October 26, 2017).  As a

result, even though Debtor's debt to Dr. Jamison, which was later assigned

to MRS, was not listed in her bankruptcy schedules, that debt was

nonetheless subject to the discharge entered in Debtor's case on October

21, 2013.  And because the debt was discharged in Debtor's bankruptcy

case, any knowing attempts thereafter by MRS to collect any

prebankruptcy debt would violate the discharge injunction.[7]

---

[7]  MRS has not argued that Debtor's debt to Dr. Jamison was excepted
from discharge under § 523(a)(3).  The Court includes this section of the decision
for clarity.  However, as discussed below, MRS's lack of notice of the bankruptcy
case may impact whether its actions in collecting the debt after discharge are
sanctionable.

MEMORANDUM OF DECISION - 23

C.      The Parties' Arguments

Debtor contends that the Entrada document given to MRS should be read to show that August 11, 2014 was the date Debtor's balance was brought forward, and not the last date she was treated by Dr. Jamison. Moreover, she contends, when its lawyers received the Notice of Bankruptcy filed by Mr. Tolson in the state court action, MRS was on notice that its debt could be subject to the discharge injunction. From that time on, Debtor argues, MRS had a duty to confirm the true facts concerning her account with Dr. Jamison's office before proceeding with the collection action.

MRS argues that the Entrada document received by MRS indicated that Debtor's last service date was August 11, 2014, and that it confirmed that date was after the date of Debtor's bankruptcy filing, something MRS confirmed by speaking to Mr. Tolson. Furthermore, MRS points out that it sought further documentation from Entrada when a request for more information was made by Debtor. Finally, because Debtor did not list Dr. Jamison on her schedules, and thus, he received no notice of Debtor's

MEMORANDUM OF DECISION - 24

bankruptcy filing, MRS contends it was Debtor's duty to prove to MRS

that the debt had been discharged.

D.    Analysis and Disposition of the Issues

As noted above, to sustain an award of sanctions, Debtor must

prove both that MRS knew the discharge injunction was applicable to the

Dr. Jamison debt, and, armed with that knowledge, that MRS intentionally

acted to collect the discharged debt.  The Court will examine each of these

requirements in turn.

///

1.    *MRS's Knowledge that the Discharge Injunction Applied to the Dr. Jamison Debt*

It appears MRS knew that Debtor had filed for bankruptcy relief as

early as October 11, 2016.  Ex. 204D.  On its internal log, the entry for that

date reads, "VER W/ BAN WEB SITE HAVEN'T FILED SINCE 2013".

From this entry, the Court infers that MRS employees consulted a

"bankruptcy web site", presumably the PACER[8] site, and that Debtor's

---

[8]  PACER stands for Public Access to Court Electronic Records, a
government site providing, free of charge, information about bankruptcy filings.

MEMORANDUM OF DECISION - 25

2013 bankruptcy case filing was disclosed. Therefore, the Court finds that

MRS was aware that Debtor had filed for bankruptcy before taking legal

action against her.

However, the Court assumes that, at the time they were researching

Debtor's account, MRS agents were operating under the belief that the

date Debtor last received services from Dr. Jamison was on August 11,

2014, and that they erroneously assumed that the $390 debt MRS was

tasked to collect from Debtor therefore arose after her bankruptcy filing.[9]

Indeed, when compared to information later obtained from Dr. Jamison, it

appears that this incorrect "services date" was perpetuated from Entrada

to MRS, and then to the Law Firm.[10] Because the MRS collection actions

were based upon a sincere, albeit incorrect, belief about whether the debt

---

[9] Ms. Anderson, the assistant manager at MRS, testified that, from looking at the summary sheet, the date the debt was incurred was August 11, 2014. Ex. 204B.

[10] It is notable, however, that the Entrada document only contains the date of the patient's "Last Visit" and as such, from the face of the document, it is plausible that some of Debtor's visits, and thus charges incurred, are being seen by Dr. Jamison prior to that "Last Visit" date, and could potentially have been incurred prior to the bankruptcy.

MEMORANDUM OF DECISION - 26

to Dr. Jamison had been discharged, MRS did not act in contempt of the

discharge injunction when it sent collection notices to Debtor, nor when it

directed the Law Firm to initiate legal action against her.

However, after suit was filed, on November 22, 2016, the quantity

and quality of information available to MRS and its lawyers significantly

changed.  On that date, Mr. Tolson filed the "Notice of Bankruptcy" in the

state court collection action filed by the Law Firm.  In the notice, Tolson

represented that the debt predated the bankruptcy filing, and was thus

discharged.  Put differently, as of that time, both MRS and the Law Firm

acquired knowledge that their assumption that the Dr. Jamison debt was

not discharged was, at least potentially, flawed.

Given the possible consequences of seeking to collect a discharged

debt, to the Court, ordinary prudence would suggest that, based upon this

notice, that MRS and its lawyers should verify with Dr. Jamison that the

information on which they were relying was indeed correct.  That they did

not is undisputed, and indeed, as the testimony at the hearing established,

making such an inquiry was apparently contrary to established MRS

MEMORANDUM OF DECISION - 27

policy.

But MRS did respond to the notice filed by Mr. Tolson in the state

court action.  An employee of the Law Firm followed up, and eventually,

on December 21, 2016, spoke with Mr. Tolson by phone.  Mr. Tolson,

perhaps relying upon the representation in the letter he received from the

Law Firm, that August 11, 2014, was the last services date, apparently

agreed during the phone conversation that the debt was indeed incurred

post-bankruptcy.  That Mr. Tolson made such an uninformed concession

without demanding proof from MRS, or obtaining better facts from his

client, was truly unfortunate because, as the testimony showed, as

Debtor's bankruptcy counsel, his representation gave the Law Firm the

"comfort" it needed to proceed with the legal action.  Again, while more

research by MRS would have averted the problems to come, the Court

concludes that Mr. Tolson's telephone statement insulated MRS and the

Law Firm from contempt of the discharge injunction to this point.[11]

---

[11]  Even after his phone conversation with the Law Firm paralegal, Mr.
Tolson had yet another opportunity to challenge the accuracy of the MRS
position when the Law Firm notified him that, absent his appearance in the state

MEMORANDUM OF DECISION - 28

Then, after the judgment was entered against her in state court, and

following service of the garnishment order on her employer, on January

23, 2017, Debtor personally called the Law Firm and "insisted" that Dr.

Jamison's debt had been included in her bankruptcy. Debtor's protests

about the collection actions were then followed a few days later by a call,

this time from Mr. Wayment, to the Law Firm. It appears that these

exchanges finally persuaded the Law Firm to explore the facts underlying

Debtor's case more completely by retrieving an itemized list of services

and charges concerning Debtor's account. Given the facts, the Law Firm's

willingness to seek accurate information was, in the Court's opinion, a step

long overdue under the circumstances. In addition, and importantly in

this context, the Law Firm's apparent decision to confirm its prior

understanding of the facts also demonstrated that it held some doubt at

that time about the propriety of the past actions of MRS and the Law Firm

in pursuing Debtor, securing a judgment, and by allowing the

---

court action, it would seek entry of default and a judgment against Debtor. He
took no action in response to the default notice.

garnishment to remain in place with Debtor's employer.

Over the next few days, there was a steady stream of emails between Mr. Wayment and Mr. Hurley at the Law Firm, wherein Mr. Wayment, consistently and persistently, posited that the Dr. Jamison debt was prebankruptcy, and that the Law Firm's failure to suspend collection actions was a violation of the Code's discharge injunction and exposed the Law Firm and MRS to possible sanctions.

All things considered, based upon Debtor's post-judgment phone call to MRS, and Mr. Wayment's protests and threats to the Law Firm, the Court finds that, thereafter, MRS and the Law Firm had sufficient credible information to charge them with knowledge that their collection activities were violating the discharge in Debtor's bankruptcy case. Their reckless failure, indeed their refusal at that point, to take affirmative steps to discontinue all collection actions against Debtor, was sufficiently knowing and intentional so as to constitute contempt of the discharge injunction.

Comparing the facts to the elements of contempt explained in the case law, the Court finds that, by the third week of February 2017, at the

MEMORANDUM OF DECISION - 30

latest, MRS and its attorneys, the Law Firm, not only knew about Debtor's

bankruptcy filing, and therefore, the existence of the discharge, but they

were also charged with the knowledge that their continuing collection

actions against Debtor may be violating the discharge injunction.  Put

another way, MRS knew that Debtor had filed for bankruptcy relief.  After

learning from Debtor and Mr. Wayment that the debt to Dr. Jamison may

have been incurred before Debtor filed, and thus had been discharged, it

was incumbent upon MRS to research the facts before proceeding to collect

from Debtor.  *See Eastman v. Baker Recovery Servs. (In re Eastman)*, 512 B.R.

832, 845 (Bankr. W.D. Tex. 2009); *Distad v. United States (In re Distad)*, 392

B.R. 482, 488 (Bankr. D. Utah 2008) ("Once it is established that a creditor

had knowledge of a debtor's bankruptcy, the creditor's good faith belief

that it had a right to the property is irrelevant to the question of the

creditor's willfulness").

    The lack of prudence and diligence collectively displayed by MRS

and the Law Firm to confirm the debt they were collecting had not been

discharged is, at best, perplexing to the Court.  The facts show that, even

MEMORANDUM OF DECISION - 31

when they were informed about Debtor's position by Debtor and Mr.

Wayment, MRS and the Law Firm required Debtor to prove to their

satisfaction that the debt to Dr. Jamison had been discharged. Their

position that Debtor was somehow in the best position to secure

supporting documentation from Dr. Jamison was a serious mistake in

judgment. After learning Debtor's position, the decision by MRS and the

Law Firm to rely upon the vague, cryptic data in the summaries they

received from Entrada was irresponsible and has consequences. While

Debtor bears the burden of proving MRS is in contempt, the refusal by

MRS and its lawyers to make even modest efforts to corroborate the

propriety of their collection actions should not insulate them from

sanctions for their violations of the discharge injunction.

    As the agent for the creditor asserting the claim, MRS, a professional

collection agent, should expect to be able, when challenged, to reliably

establish that the debt upon which any money judgment it secures is a

valid one. Consider the impracticality of MRS's position: Debtor allegedly

owed an unpaid debt to a medical provider. Despite her repeated

MEMORANDUM OF DECISION - 32

insistence that the debt had been discharged in bankruptcy, the collection

agency and law firm assigned to collect the debt by the provider's billing

agent expected Debtor to contact the provider to secure the billing records

to prove her defense to the collection actions.

This Circuit's case law makes clear that MRS's policy is not only an

impracticable one, as in this case, it may constitute contempt.   In a case

involving similar facts, the BAP explained that:

> there is no merit in [the creditor's] position that the discharged
> debtor was obliged to take the initiative to clarify the
> discharge issue: "if debtor believed his bankruptcy
> immunized him from enforcement of the judgment, then he
> should" obtain an order from the bankruptcy court to that
> effect.  Such an order already existed in the form of the
> discharge order, with its statutory injunction, enforceable by
> contempt proceedings.

*In re Gurrola*, 328 B.R. 158, 174-75 (9th Cir. BAP 2005).  More to the point,

the *Gurrola* panel continued:

> [The creditor's] position is remarkably similar to that of the
> automatic stay violator we encountered in *Morris v. Peralta (In
> re Peralta)*, 317 B.R. 381, 389 (9th Cir. BAP 2004), who thought
> that he could safely quibble with a debtor about the automatic

MEMORANDUM OF DECISION - 33

> stay.  We held that debtors do not bear the burden of proving
> to creditors the existence of the automatic stay before
> stay-violation liability can be imposed.  *Id*. at 389.  The same
> basic analysis applies to the discharge and discharge
> injunction.

*Id*. at 175; *see also In re Jones*, 389 B.R. 146, 162-63 (Bankr. D. Mont. 2008)

(debtors bore no burden of proving the existence of the discharge

injunction to the collection agency and its attorney).  As the BAP makes

clear to creditors, there is "no merit to [a creditor's] insistence on better

proof of the existence of the bankruptcy before he can be charged with

willfulness."  *In re Peralta*, 317 B.R. at 389.

Notwithstanding the MRS policy, once given plausible information

that Debtor had filed for bankruptcy and that the subject debt was

discharged, the onus was thereafter on MRS to confirm the dates of

Debtor's treatment with Dr. Jamison to ensure MRS was not violating the

discharge injunction by attempting to collect from Debt.   In sum, on these

facts, the Court finds and concludes that as of February 21, 2017, MRS and

its lawyers had been given sufficient information to be charged with

knowledge that, not only had Debtor filed a bankruptcy petition, but that

MEMORANDUM OF DECISION - 34

the debt it was seeking to collect had been discharged.

### 2. *Intentional Acts*

The second prong of the analysis focuses on whether MRS intended the acts which violated the injunction. The Court concludes that it did.

MRS retained the Law Firm; the Law Firm represented MRS. While the Law Firm had asked MRS for more detailed information pertaining to the dates of Debtor's visits to Dr. Jamison, it nonetheless continued to press forward with the collection suit. In particular, despite Mr. Wayment's protests, and without further proof from his client, Mr. Hurley refused to stand down on his efforts to collect the debt until Debtor herself obtained the billing and medical records proving her point and provided them to MRS. And even then, MRS and the Law Firm merely stopped the garnishment. They made no effort to vacate the void default judgment, nor to remove it from county records, until they received independent verification of Debtor's documentation from Dr. Jamison. Moreover, at the hearing on the Motion, counsel for MRS acknowledged that the state court collection suit had not been dismissed and presumably remains pending,

MEMORANDUM OF DECISION - 35

potentially still impacting Debtor's credit report, among other things.

These were all intentional acts, or in some cases, intentional failures to act, all of which violated the discharge injunction.

D.    Damages

If a knowing and willful violation of the discharge injunction is established, a bankruptcy court may award the debtor the actual damages she suffered as a result of the conduct, as well as any attorney fees and costs expended to remedy the violation.  *In re Dickerson*, 510 B.R. at 298. Generally, however, "punitive damages are not an appropriate remedy for § 105(a) contempt proceedings, [but] 'relatively mild' noncompensatory fines may be acceptable in some circumstances."  *In re 1601 W. Sunnyside Dr. #106, LLC*, 10.4 I.B.C.R. 110, 113 (Bankr. D. Idaho 2010) (quoting *In re Dyer*, 344 F.3d at 1193-94).[12]

While a myriad of potential kinds of damages can result from a

_____

[12]    Largely because of Mr. Tolson's willingness to concede to MRS that Debtor's debt to Dr. Jamison was not discharged, the Court announced following the evidentiary hearing that punitive damages are not appropriate in this case. The Court now adheres to that conclusion.

MEMORANDUM OF DECISION - 36

discharge injunction violation, Debtor submitted no competent proof to

establish that she deserves compensation.  While she testified about the

apprehension and inconvenience she suffered in securing the information

needed to persuade MRS to finally discontinue its collection efforts, the

Court finds that the facts here do not support any award for emotional

distress.  Nor did Debtor attempt to document any damages she suffered

for lost wages or other out-of-pocket expenses.

At bottom, while Debtor has established that MRS knowingly

violated the discharge injunction, her damages here are limited to the

attorneys fees and costs she incurred to rectify the discharge violation.

Following the evidentiary hearing on the Motion, Mr. Tolson filed an

Affidavit including the billing records for services both he and Mr.

Wayment provided to Debtor to address the MRS collection over

approximately eight months.  Dkt. No. 62-1.  Based upon this information,

Debtor seeks to recover a total of $8,025 in fees and $260 in costs from MRS.

MRS objected to Debtor's memorandum of costs and fees on the basis that

it was premature, and that the fees sought were excessive, unreasonable,

MEMORANDUM OF DECISION - 37

and unnecessary.  Dkt. No. 63.

After review, in the exercise of its discretion, the Court finds and

concludes that MRS should be required to pay Debtor $6,500 for attorneys

fees, and $260 for costs, as compensation for the discharge violation in this

case.[13]  It is undisputed that, but for the actions of her attorneys and their

contacts with the Law Firm, and in pursuing the contempt motion, all of

which efforts were opposed by MRS and the Law Firm, Debtor would have

further suffered the indignity and inconvenience of the MRS collection

actions.  Under these facts, MRS should be required to compensate Debtor

for her reasonable attorneys fees and costs to rectify MRS's inappropriate

conduct.

---

[13]  Inexplicably, Debtor did not name the Law Firm as a party to the
Motion even though the lawyers' actions contributed significantly to Debtor's
predicament.  That MRS is held to account in this case for the conduct of its
attorneys should be expected.  *See Cmty. Dental Servs. v. Tani*, 282 F.3d 1164, 1168
(9th Cir. 2002) (explaining that a client is both chargeable for its counsel's acts
because  the client is presumed to have voluntarily chosen the lawyer as its
representative and agent, and therefore, a client is "considered to have notice of
all facts known to their lawyer-agent.") quoting *Ringgold Corp. v. Worrall*, 880
F.2d 1138, 1141–42 (9th Cir. 1989); *see also Pioneer Inv. Servs. Co. v. Brunswick
Assocs. Ltd. P'ship*, 507 U.S. 380, 396–97 (1992).

MEMORANDUM OF DECISION - 38

### *Conclusion*

Though it was not listed in her schedules, Debtor's debt to Dr.

Jamison for treatments provided to her prior to her bankruptcy filing was

discharged.  It is undisputed that MRS was aware that Debtor had filed for

bankruptcy, and was therefore charged with knowledge that she received a

discharge, even before it commenced its efforts to collect the debt from

Debtor.  Debtor and her lawyers informed MRS and its lawyers that the

debt was discharged, albeit belatedly.  Despite receipt of this information,

MRS and the Law Firm refused to discontinue collection activities until

Debtor could prove to them that Dr. Jamison's debt arose before Debtor's

bankruptcy was filed.  The approach taken by MRS and the Law Firm

misconstrued the parties' respective duties and constituted a knowing

violation of the discharge injunction.

Debtor's Amended Motion for Sanctions will be granted by separate

order.  MRS will be required to pay Debtor $6,500 for attorneys fees and

$260 for costs, as compensatory sanctions.  In addition, MRS will be

ordered to immediately take all required steps to ensure that the state court

MEMORANDUM OF DECISION - 39

collection action against Debtor is dismissed with prejudice.

Dated:  November 22, 2017

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 40